45 F.3d 830
 63 USLW 2462
 UNITED STATES of America, for the use and benefit of Global
Building Supply, Incorporated; United States of America,
for the use and benefit of Superior Supply Associates,
Incorporated, Plaintiffs-Appellees,
v.
HARKINS BUILDERS, INCORPORATED, Defendant-Appellant,
and
WNH Limited Partnership; Thomas P. Harkins, Incorporated;
Toledo Drywall, Incorporated; Today Contractors,
Incorporated; The Federal Insurance
Company, Defendants.
 No. 94-1136.
 United States Court of Appeals,
Fourth Circuit.
 Argued Sept. 28, 1994.
Decided Jan. 25, 1995.
 
 ARGUED: Stephen Lewis Best, Sr., Fairfax, VA, for appellant. Robert Keith Richardson, Odin, Feldman & Pittleman, P.C., Fairfax, VA, for appellees.
 Before NIEMEYER and LUTTIG, Circuit Judges, and PHILLIPS, Senior Circuit Judge.
 Affirmed in part, reversed in part, and remanded by published opinion. Judge NIEMEYER wrote the opinion, in which Judge LUTTIG joined. Senior Judge PHILLIPS wrote a separate dissenting opinion.
 OPINION
 NIEMEYER, Circuit Judge:
 
 
 1
 We are presented with the question of first impression whether a judgment creditor, pursuing a garnishment proceeding against a garnishee who owed money to the judgment debtor under a contract, is bound by a mandatory arbitration clause in that contract.
 
 
 2
 Global Building Supply, Inc., and Superior Supply Associates, Inc. (hereafter collectively, "Global Supply") supplied drywall materials to drywall subcontractors, Toledo Drywall, Inc. and Today Contractors, Inc. (hereafter collectively, "Toledo Drywall").[1] When Toledo Drywall failed to pay for the materials, Global Supply obtained a judgment against it in federal court in the amount of $278,520. In an effort to collect the judgment, Global Supply initiated a garnishment proceeding against Harkins Builders, Inc. to attach monies owed by Harkins to Toledo Drywall under a contract between them. As garnishee, Harkins confessed assets but alleged that the amount it owed to Toledo Drywall should be reduced by setoffs totalling $50,853 allegedly owed by Toledo Drywall to Harkins under their contract. Moreover, Harkins argues that any dispute about these setoffs must be resolved through arbitration, as also provided in the contract.
 
 
 3
 The district court rejected the contention that resolution of the amount of money owed by Harkins to Toledo Drywall and subjected to garnishment must be accomplished through arbitration. After determining the amount subjected to garnishment, the court entered judgment in the garnishment proceeding in favor of Global Supply against Harkins in the total amount of $116,340, without specifically addressing the major portion of Harkins' claimed setoffs. On Harkins' appeal, we affirm the district court's ruling that the amount subjected to garnishment should not be determined by arbitration, but we remand the case for resolution of the legal and factual questions raised by Harkins' setoff claim.
 
 
 4
 * Harkins was the general contractor for the construction of an apartment complex in Prince William County, Virginia. The complex was being constructed by WNH Limited Partnership for the Department of the Navy to house naval personnel. The drywall work on the project was performed by Toledo Drywall, which purchased its materials from Global Supply. When Toledo Drywall failed to pay Global Supply for the materials, Global Supply obtained a judgment against Toledo Drywall in federal court in the amount of $278,520 plus interest, costs, and attorneys fees.
 
 
 5
 To enforce the judgment, Global Supply sought to attach monies owed by Harkins to Toledo Drywall for work performed on the project. Global Supply filed a garnishment proceeding against Harkins, demanding that the money which Harkins owed to Toledo Drywall be paid directed to Global Supply in partial satisfaction of the judgment. Harkins acknowledged that it owed Toledo Drywall $119,823, but asserted that, under its contract with Toledo Drywall, it was entitled to setoffs for attorneys fees and expenses incurred by Harkins in respect of Toledo Drywall's defaults in failing to pay its suppliers. While Global Supply stipulated that Harkins was entitled to a setoff of $3,484 incurred by Harkins in bonding off certain mechanic's liens, it contended that Harkins is not entitled to a setoff of the remaining $47,369 in attorneys fees incurred by Harkins in defending mechanic's liens proceedings and Miller Act[2] claims arising from Toledo Drywall's defaults. Harkins contended that by reason of an arbitration clause in the contract between it and Toledo Drywall, any dispute over the setoff should be resolved by arbitration.
 
 
 6
 The district court rejected the contention that the dispute over the amount subjected to garnishment should be determined in arbitration and found that Harkins owed Toledo Drywall $116,340, representing the $119,823 owed less the $3,484 stipulated setoff. On the remaining $47,369 setoff claim asserted by Harkins, the magistrate judge, who heard the case in the first instance, stated, "For reasons I've articulated I'm going to sustain the objections of the creditor." The magistrate judge, however, gave no other reasons in his opinion for denying the setoffs claimed by Harkins, and his recommendations were adopted by the district judge without further comment.
 
 II
 
 7
 In seeking to enforce its federal money judgment against Toledo Drywall, Global Supply's rights are governed by Federal Rule of Civil Procedure 69(a), which provides in relevant part:
 
 
 8
 Process to enforce a judgment for the payment of money shall be a writ of execution.... The procedure on execution, ... in proceedings on and in aid of execution shall be in accordance with the practice and procedure of the state in which the district court is held....
 
 
 9
 Since the judgment in this case was obtained in the Eastern District of Virginia and its enforcement was initiated in that district, Virginia's practice and procedure is borrowed by federal rule for the purpose of enforcing the judgment through a writ of execution. Even though we look to state law to determine the practice and procedure to be followed in the execution of a judgment, we do so in furtherance of federal law, giving effect to rules entitling parties to enforce federal judgments in federal courts. Consequently, any aspects of the assimilated practices and procedures that are uniquely designed to enforce state judgments are not assimilated, nor is any aspect that may be inconsistent with the federal policy of affording judgment creditors the right to a writ of execution to enforce money judgments in federal courts. See generally 12 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure Sec. 3012, at 69 (1973) (substantial compliance with state procedural provisions is sufficient).
 
 
 10
 Under Virginia law, a money judgment is enforced by the issuance of a writ of fieri facias and delivery of the writ to a "proper officer" of the court for enforcement. See Va.Code Ann. Sec. 8.01-466 (1992). The writ commands the officer "to make the money therein mentioned out of the goods and chattels of the person against whom the judgment is." Va.Code Ann. Sec. 8.01-474 (1992). When the property is not subject to levy pursuant to the writ of fieri facias, it nevertheless becomes subject to a lien upon delivery of the writ to the sheriff or other officer. Va.Code Ann. Sec. 8.01-501 (1992). And when the property is in the hands of a third person, the lien of execution may be enforced through a garnishment proceeding. See Va.Code Ann. Sec. 8.01-511 (1992).
 
 
 11
 Under Virginia law, a garnishment proceeding is a separate proceeding in which the judgment creditor enforces the "lien of his execution" against property or contractual rights of the judgment debtor which are in the hands of a third person, the garnishee. Lynch v. Johnson, 196 Va. 516, 84 S.E.2d 419, 421 (1954); see also Butler v. Butler, 219 Va. 164, 247 S.E.2d 353, 354 (1978). The summons issued in a garnishment proceeding "warns" the garnishee not to pay the judgment debtor's money to the judgment debtor, with the sanction that if the garnishee were to do so, it would become personally liable for the amount paid. Lynch, 84 S.E.2d at 421. Thus, "the creditor 'does not acquire a clear and full lien upon the specific property in the garnishee's possession, but only such a lien as gives him the right to hold the garnishee personally liable for it or its value.' " Id. at 421-22. In other words, by act of garnishment, the judgment creditor does not replace the judgment debtor as owner of the property, but merely has the right to hold the garnishee liable for the value of that property. So too in this case, where the property is in the form of a contract right, the judgment creditor does not "step into the shoes" of the judgment debtor and become a party to the contract, but merely has the right to hold the garnishee liable for the value of that contract right.
 
 
 12
 The garnishee can escape all garnishment liability, however, by surrendering the funds to the court for its proper disposition. See In re Lamm, 47 B.R. 364, 368 (E.D.Va.1984). The garnishee is required to respond to the garnishment summons by confessing the amount owed to the judgment debtor or by denying it has any property of the judgment debtor. It may also pay such monies into court as it confesses. If liability or the amount confessed is disputed, the court determines whether the garnishee holds property belonging to the judgment debtor and the property's value.
 
 
 13
 To summarize, Global Supply may execute on its money judgment against Toledo Drywall in federal court through garnishment practices and proceedings borrowed from Virginia. And when parties dispute the existence or amount that has been subjected to the lien of execution, the federal court must resolve the questions of whether the garnishee holds money owed to Toledo Drywall and the amount thereof.
 
 
 14
 Harkins contends that in establishing the amount it owes Toledo Drywall, the court should reduce the amount by a $50,853 setoff representing attorneys fees and costs Harkins incurred in defending lien claims and Miller Act claims against the project which arose by reason of Toledo Drywall's defaults on the project. Harkins further contends that any dispute over the amount must be resolved by arbitration as specified by the contract between Harkins and Toledo Drywall. The contract's arbitration clause provides:
 
 
 15
 All claims, disputes and other matters in question arising out of, or related to, this Subcontract, or the breach thereof ... shall be decided by arbitration.... This agreement to arbitrate shall be enforceable pursuant to and interpreted under the laws of the State of Maryland.
 
 
 16
 Global Supply, however, was not a party to the contract between Harkins and Toledo Drywall and was not a third-party beneficiary of the contract. That contract intended to facilitate construction of an apartment complex for the Navy and not to afford benefits to third party suppliers. Indeed, the contract specifically stated that suppliers such as Global Supply were not to be considered third-party beneficiaries. As a judgment creditor of Toledo Drywall, Global Supply is a stranger to the contract, and its interest is limited to Toledo Drywall's property interest in Harkins' hands. Harkins nevertheless argues that Global Supply, in looking to the contract to determine the amount of Toledo Drywall's contract interest, somehow becomes bound by all the benefits granted and burdens imposed by the contract. In making this argument, Harkins relies on the statement from Lynch that the garnishor "stands upon no higher ground than the judgment debtor." 84 S.E.2d at 422. Read in context, however, it is apparent that the court in Lynch simply recognized that the garnishor can reach no more property from the garnishee than that which represents the judgment debtor's property in the hands of the garnishee. To argue that the garnishor stands "in the shoes" of the judgment debtor for any other purpose poses the risk of inserting the judgment creditor as another party to the contract. Following this line of reasoning to an extreme, the judgment creditor could thus argue that it was entitled to assume the judgment debtor's obligations and perform the contract, to earn money that the judgment debtor would otherwise have been entitled to earn. Such an argument, we conclude, distorts the role of garnishment, which is simply to enforce a judgment against property of the judgment debtor in the hands of a third person.
 
 
 17
 It is not disputed that in measuring the value of the judgment debtor's property interest in the contract, the contract terms must be consulted. But this does not compel the conclusion that the contract's procedural mechanisms for determining contract rights must displace court procedures when a stranger to the contract litigates the value of those rights. The parties to this contract agreed to arbitration as an efficient procedural mechanism for resolving contractual disputes, including disputes over amounts owed. But that agreement to arbitrate does not add or subtract value in the calculus for determining the value of the contract right. Since the judgment creditor is afforded court procedures for determining this value, the fact that the property before the court was created by a contract containing an arbitration clause does not require a stranger to the contract to follow the contract's procedural mechanisms for dispute resolution.
 
 
 18
 There are other good reasons for application of this rule in this case. If arbitration were to be ordered, the proceeding would presumably be attended only by the contracting parties, leaving Global Supply's interests essentially unprotected since it was not a contracting party. If we were to designate Global Supply a party to the arbitration in addition to or in lieu of Toledo Drywall, we would, by judicial fiat, be modifying the agreement reached by the parties. It might be argued that if Global Supply were not a party to the arbitration, its interest nevertheless would be protected by Toledo Drywall because Toledo Drywall's interest parallels Global Supply's. Toledo Drywall, however, would have an incentive to maximize its property interest in the contract only if it were a going concern with property and a credit reputation at stake. Apparently that may not be the case here, as Toledo Drywall essentially abandoned its responsibilities for the project and did not participate in this appeal.
 
 
 19
 Concerns for judicial efficiency also weigh in favor of applying the rule here. If the court were to permit a separate arbitration between the parties to the contract to determine the value of the contract right in this case, it would have to stay its hand pending the arbitration of a portion of the dispute which would take place in a foreign state beyond the control of both the court and Global Supply, the prosecuting party in this proceeding. In the circumstances of this case we refuse to impose a delay and inconvenience of this type on a judgment creditor who did not agree to an arbitration clause and who is entitled by law to have its federal judgment enforced in and by a federal court.
 
 
 20
 At bottom, we agree with the district court's conclusion that the value of Toledo Drywall's contractual interest in its contract with Harkins must be determined by the court and that Global Supply is not bound to follow arbitration procedures provided in the contract creating the asset which it seeks to attach. See also Able Distrib. Co. v. Lampe, 160 Ariz. 399, 773 P.2d 504, 515 (App.1989) (holding that judgment creditor seeking under Arizona law to attach a contract interest by way of garnishment is not bound by contract's arbitration clause).
 
 III
 
 21
 The parties do not dispute that Harkins owes Toledo Drywall $119,823, without taking into account any claimed setoffs, for work done on the project. They have also stipulated that under the contract between Harkins and Toledo Drywall, Harkins is entitled to a $3,484 setoff for expenses it incurred in bonding off mechanic's liens created by reason of Toledo Drywall's failure to pay suppliers. Accordingly, the district court entered judgment in favor of Global Supply in the amount of, stated precisely, $116,339.53.
 
 
 22
 Harkins contends that, in addition to the $3,484 setoff, it is entitled to further setoffs of $47,369, representing attorneys fees and expenses incurred in defending mechanic's liens claims and Miller Act claims brought by the unpaid suppliers of Toledo Drywall. Harkins relies on provisions of its contract with Toledo Drywall to support its claimed setoffs.[3]
 
 
 23
 In considering Harkins' claims, the magistrate judge said simply:
 
 
 24
 This procedurally is before the court on [Global Supply's] objections to the answers of [Harkins]. For reasons I've articulated I'm going to sustain the objections of the creditor.
 
 
 25
 But the magistrate judge gave no reasons in his opinion for rejecting Harkins' claimed setoffs, making no findings of fact or rulings of law, and the district judge adopted the conclusion without further comment. Since the district court did not address Harkins' claims expressly and we cannot tell whether the court considered the contractual provisions and facts which Harkins alleges provide support for its claimed setoffs, we remand the case to the district court for the determination of whether Harkins is entitled to further setoffs, and if so, the amount thereof.
 
 
 26
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS.
 
 PHILLIPS, Senior Circuit Judge, dissenting:
 
 27
 I agree with the majority that, if Harkins is not entitled to arbitration, the district court's failure adequately to explain its reasons for rejecting Harkins' claimed setoffs requires that we remand this case for further proceedings. I would hold, however, that Global Supply should be bound by the arbitration clause in the contract between its garnishee, Harkins, and its judgment debtor, Toledo Drywall. Accordingly, I respectfully dissent.
 
 I.
 
 28
 I do not believe that the majority's thoughtful exegesis of the Virginia law of attachments and garnishments takes us as far as does the majority. While it may be true that "by act of garnishment, the judgment creditor does not replace the judgment debtor as owner of the property, but merely has the right to hold the garnishee liable for the value of that property," ante, at 833-34, when the property in question is a money debt, the distinction seems to me to be one without a difference. I think there is little to be gained, therefore, in seeking to determine whether the judgment creditor does or does not "step into the shoes" of the judgment debtor. Quite obviously, the judgment creditor does not step into the debtor's shoes for purposes of assuming duties owed the garnishee (beyond those duties reducible to contractual setoffs). With equal certainty, it does no violence to the metaphor to conclude that the judgment creditor does step into the debtor's shoes for purposes of calculating the value of the debtor's property in the hands of the garnishee. Given that the judgment creditor can be said to step into its debtor's shoes for some purposes and not for others, whether it should be understood to step into the debtor's shoes for purposes of a contractual arbitration provision cannot be answered in the abstract, as though it were a question of metaphysics. In order to determine, with regard to any contractual provision, whether a judgment creditor should be bound as is its debtor, resort must be made to underlying policy concerns.
 
 
 29
 I read the majority opinion to identify two policy factors that militate against holding Global Supply bound to the arbitration provision in the Harkins-Toledo Drywall contract. First, the majority observes that were we "to designate Global Supply a party to the arbitration in addition to or in lieu of Toledo Drywall, we would, by judicial fiat, be modifying the agreement reached by the parties." Ante, at 835. I cannot agree, for I believe that this statement confuses two distinct issues: whether an arbitration agreement between parties can bind nonparties, and whether a particular contractual arbitration provision purports to bind nonparties. Global Supply and Harkins have joined issue only on the former. That is, Global Supply appears to concede (rightly, I believe) that, solely as a matter of contract interpretation, the arbitration provision does appear to bind nonparties such as judgment creditors. Thus, any reasons to hold that Global Supply is not bound to arbitrate the contractual setoffs must arise by operation of background law. A conclusion that Global Supply is bound to arbitrate would not "be modifying the agreement reached by the [contracting] parties," Harkins and Toledo Drywall. Consequently, the only arguable policy reason for holding Global Supply not bound to arbitrate lies, to my mind, in the second factor that the majority identifies--judicial economy.
 
 
 30
 While such considerations must be taken seriously,* there are powerful countervailing factors of simple equity between the contending parties that I would treat as dispositive in favor of holding Global Supply bound to the arbitration provision. Indeed, the equities seem to me overwhelmingly in favor of that result.
 
 
 31
 An arbitration provision, after all, confers a substantial contractual right for which a party often gives valuable consideration. It seems unfair that a garnishee should be stripped of her contractual right to demand arbitration on the mere happenstance that the person asserting contractual rights against her is a nonparty whose interest arises only by virtue of the misfeasance of the garnishee's creditor. On the other hand, there is no unfairness of which the garnishing judgment creditor can complain if the contract between garnishee and judgment debtor is construed to require him to arbitrate disputes regarding the value of the property the garnishee owes the debtor. To be sure, the garnishor might prefer not to be bound by such an arbitration provision, but he will just as likely prefer not to be bound by other "substantive" provisions of the contract--for example, a clause that permits the garnishee to deduct attorneys fees incurred in defense of a garnishment proceeding brought to recover monies owed on the contract. There is no qualitative difference between the two that makes imposition of the former inequitable while imposition of the latter remains equitable, indeed transparently so.
 
 II.
 
 32
 In sum, I agree with the majority that just because "the contract terms must be consulted" when a garnishee disputes the amount of its contractual obligation to the garnishor's judgment debtor "does not compel the conclusion that the contract's procedural mechanisms for determining contract rights must displace court procedures." Ante, at 834. Whether we should affirm that conclusion even though it is not compelled is inescapably a question of policy and thus a matter of judgment. While I do not pretend that resolution of that policy question is simple, I conclude that the better rule would be that a judgment creditor, pursuing a garnishment proceeding against a garnishee who owes money to the judgment debtor under a contract, is bound by a mandatory arbitration clause in that contract. Accordingly, I would remand to the district court with an order that it stay the garnishment action pending resolution of the disputed setoffs in an arbitration proceeding conducted pursuant to the terms of the Harkins-Toledo Drywall contract.
 
 
 
 [1]
 The lawyers for Global Building Supply and Superior Supply have, for simplicity, combined their claims against Toledo Drywall and Today Contractors and have agreed to apportion any recovery outside of court. Accordingly, we treat the claims of Global and Superior against Toledo Drywall and Today Contractors as one claim
 
 
 [2]
 The Miller Act, 40 U.S.C. Sec. 270a, requires a bond to be posted by a prime contractor on a federal government construction project in order to assure payment to certain subcontractors. See United States v. WNH Limited Partnership, 995 F.2d 515 (4th Cir.1993)
 
 
 [3]
 In particular, Harkins argues that, under the contract, Toledo Drywall had a duty to keep its work free from mechanic's liens. As Article 8 of the contract specifies:
 Subcontractor [Toledo Drywall] shall not permit any liens to be filed against the project of which the Work is a part, or any part thereof by anyone claiming under or through the Subcontractor. In the event that liens are filed by anyone claiming under or through the Subcontractor in relation to the Work, Subcontractor agrees to have such liens discharged within five (5) days of the date of the notice of lien, by posting a bond ... or otherwise. In the event such liens are not so discharged, Contractor [Harkins] may, in addition to all other remedies available to it, discharge such liens and deduct the full cost thereof including court costs and attorneys' fees from payment due Subcontractor.
 (Emphasis added). Further, Harkins argues that, in the event of Toledo Drywall's breach of Article 8, Harkins was entitled to avail itself of the remedies provided in Article 12 of the contract, including the rights:
 to cure the breach itself and deduct the full cost thereof including any court costs and attorney's fees from the payments due Subcontractor [or] to terminate this Subcontract by written notice, which shall be effective upon receipt by Subcontractor, and take over all or any work, tools, equipment, materials and supplies of Subcontractor ... and complete the work by whatever means Contractor deems appropriate, whereupon Subcontractor shall receive no further payments until the work is completed and shall be fully liable for all costs resulting from Contractor's completing the work.
 (Emphasis added).
 
 
 *
 This is not necessarily to accept the majority's assertion that the rule it adopts will further judicial economy. The significant likelihood that any judicial interpretation of a complicated commercial contract will be appealed (and, as here, reversed and remanded) suggests that it might be more efficient for the trial court to order binding arbitration and then to stay its own proceedings